UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN RE:<br><br>LIANA SUE CONKLIN<br><br>                        **Debtor.** | Case No.: 18-30263<br><br>Chapter 13 |
| Kevin Juber et al.<br>                        **Plaintiffs,**<br>vs.<br>Liana Sue Conklin<br>                        **Defendant.** | Adversary Proceeding: 18-03026 |

**BRIEF IN SUPPORT OF DEFENDANT LIANA SUE CONKLIN**

**Chapter One – The Qualified Education Loans**

The Order Granting Plaintiff's Motion for Partial Summary Judgment (docket entry 21, filed December 3, 2018) determined the loans provided by Great Lakes Higher Education Corporation ($40,710.12), Firstmark Services ($24,768.77), and Chase Student Loans ($23,657.53) -- (collectively, "Private Student Loans") -- each constituted qualified education loans ("QELs") as described in 26 U.S.C. §221(d)(1).

Although actual documentation of the Private Student Loans was not produced by the lenders in response to subpoenas by the Jubers, and no production of those loan documents was otherwise available, the Court determined the Private Student Loans provided by Great Lakes Higher Education Corporation, Firstmark Services, and Chase Student Loans were "each educational loans that would be excepted from discharge under 11 U.S.C. § 523(a)(8)."

The QELs issue is complete as to only the original Private Student Loans received by Liana Conklin. Phase One of the Jubers' dischargeability action proceeding favors the Jubers' position.

**Chapter Two – The "Oral Loan"**

Christopher Juber ("Kip" or "Christopher") and Liana Conklin ("Debtor" or "Liana") were engaged to be married in December 2014 which prompted Kevin and Linda Juber ("the Jubers") to pay off Liana's Private Student Loans. The Private Student Loans' interest rates were relatively high (between 8.25% and 10.92%), and the Jubers wished for the kids to start their life together on sound financial footing. The Jubers obtained a home equity line of credit on December 31, 2014 with Savings Institute Bank and Trust "(HELOC"), secured by the Jubers' primary residence, and used this credit line to pay Debtor's Private Student Loans. The

1

HELOC's interest rate was 1.99% for the first twelve (12) months, and increased to 3.25% thereafter.

The terms to repay the Jubers were set forth via a casual oral agreement, hereinafter the ("Oral Loan"), simply summarized as "Repay the HELOC". A conversation via text messages between Debtor and Juber on February 17, 2015 (Plaintiff's Exhibit 3), in real-time summarizes the actual extension of the loan and lack of solid terms of repayment at the time the Oral Loan was made. It also reflects the casual nature that existed as to the transaction, paraphrased as follows:

| | |
|---|---|
| Juber to Debtor: | Requests mailing addresses "for each of the providers" so he can "get them set up in bill pay." |
| Debtor to Juber: | Advises she has e-mailed Juber. |
| Juber to Debtor: | Acknowledges receipt. |
| Juber to Debtor: | Payments for the Great Lakes, Chase, and Firstmark loans have been sent. Juber advises the first HELOC payment is due March 24, suggests making an extra or partial payment depending on when her last Private Student Loan payments were, and provides the bank routing and account number. |
| Debtor to Juber: | Inquiry as to the best way to make payments. Suggests Kip may be able to walk her through setting payments up. |
| Juber to Debtor: | Suggests a recurring payment of "$900-?" to be delivered before the 24th of each month beginning in March. Suggests making an extra payment. "*We can talk about this later.*" [Emphasis added]. |

Oral Loan repayments were made either directly to the HELOC, or to the Jubers, who applied it to the HELOC. It is noteworthy that Mr. Juber obtained a HELOC from his bank for himself and his wife to "pay off" the Debtor's QELs and make the subsequent Oral Loan. The terms of the HELOC state: "III. PROMISE TO REPAY AND TO FOLLOW THIS AGREEMENT. 4) USE OF CREDIT ACCESS DEVICES. Loan Advances may only be used primarily for personal, family or household purposes…" (Plaintiff's Exhibit 1).

It appears that the Jubers never received the actual loan documents from the original Private Student Loan lenders. There is necessarily a concerning that the QELs loan provisions were not provided to the Jubers which raises the issue in Chapter Two – If the Jubers did not obtain the original loan documents, it is apparent that no statutory or contractual provisions contained in the QELs were made known to the Jubers and incorporated in the Oral Loan.

An additional issue clouds the Jubers' position concerning the Oral Loan: The casual nature of the loan led Debtor to believe the Jubers were trying to put Kip and Debtor, as a couple ("Them"), on a better financial track for their future household and financial future. As Kip and Debtor were soon to be married, the consolidation of the loans was to help "Them" out as they began their lives together. It was understood by the Debtor that "They" (meaning both Kip and Debtor") were responsible for payments timely reaching the Jubers each month. A November 23, 2015 e-mail to Debtor from Mr. Juber *acknowledged "At the time, we accepted that our son*

2

*would need to become partially responsible for your debt by co-signing the loan due to the pending marriage. However that responsibility will need to fall back on your immediate family who likely co-signed your original obligations or to other relatives."* [Emphasis added].

If the November 23, 2015 e-mail is an acknowledgement that Kip was jointly responsible for the Oral Loan, then the Oral Loan fails to meet the standard of a QEL per 26 U.S.C. § 267(b) which excludes "indebtedness owed to a person who is related." The November 23, 2015 e-mail is the "smoking gun" that undermines the Jubers' contention that the loan was solely for the benefit of Debtor and not to "Them." If the November 23, 2015 e-mail is not an acknowledgement that Kip was jointly responsible for the Oral Loan, the entire Oral Loan is defective as a mutuality of understanding of the terms of an oral loan must exist between the parties to the loan.

Counsel for the Jubers insists that the November 23, 2015 (immediate post breakup) e-mail from Kevin and Linda Juber to Debtor (Plaintiff's Exhibit 7) "is the only evidence of Christopher Juber's purported liability for the debt at issue – the "Oral Loan."

It is noteworthy that the Jubers contend that language the Jubers included in the post engagement breakup e-mail of Exhibit C is a self-serving post-breakup reaction. It overlooks the fact that the Jubers were content with the Oral Loan's lack of written verification, and states that the co-liability was due to the pending marriage. As an experienced business executive married to an employee at UCONN, Mr. Juber knew bettr!

It is obvious that the Oral Loan was a magnanimous gesture by the Jubers in celebration of Kip and Liana's engagement after six (6) years of togetherness – including Kip's residence in the Conklin home when Kip joined the U.S. Navy. There was genuine affection between the parties in this matter: Mr. Juber referred to himself as "Dad" to Debtor, who he considered as a daughter. Kevin Juber's November 17, 2015 e-mail states "Our decision to allow you access to our line of credit may not have been a wise choice for Linda & I, but we have always tried to help our children wherever possible." (Plaintiff's Exhibit 8).

Additionally, the Oral Loan had no stated condition that a broken engagement would constitute a default, allow the Jubers to declare a breach of the Oral Loan, and demand Debtor sign one of a series of written unsecured promissory notes that included numerous provisions unfavorable to the Debtor.

The total scarcity of reported decisions involving alleged non-dischargeable qualified education loans is outstanding! <u>Gorosh v. Posner</u> (In re Posner) 434 B.R. 800 (Bank. E.D. Mich. 2010) is one of the very few reported decisions involving family members or friends who offer financial assistance to a similarly situated debtor, and then seek to have the assistance declared a non-dischargeable debt. The creditor in Posner was a family friend who co-signed several student loans for the debtor. After the debtor defaulted, the family friend paid the loans and later filed an adversary proceeding seeking to have the debt declared non-dischargeable under § 523(a)(8). The Court reviewed the policy considerations and determined that the statute "necessarily limits the parties who may take advantage of the statute's protections." In this case, the plaintiff was not a protected lender because she never loaned money to the Debtor although she co-signed the loan and paid it off as a general unsecured creditor and was not a lender protected by § 523(a)(8).

In this case at bar, the Jubers did not loan money directly to the Debtor. It was an "Oral Loan" with no documentation signed by the Debtor or the Jubers. As is often the case, the lack of

3

documentation "muddies the water" and undermines the Jubers' contention that the "Oral Loan" meets the statutory definition and requirement sufficient to retain any semblance of being a "refinance" of a QEL.

There is no scarcity of proof that the Oral Loan fails to be successfully morphed into the "refinance" of the QELs per the guideline of 11 U.S.C. § 523(a)(8):

a. The alleged "refinance" were simply funds received from the home equity line of credit with Savings Institute Bank and Trust, secured by the Jubers' primary residence. The Jubers, in turn, used the HELOC proceeds to pay the Three Private QEL Loans.

b. The payment of the QELs was totally funded by the HELOC of the Jubers – not the Jubers and the Debtor.

c. The alleged "refinance" was not made pursuant to a student loan program of a governmental unit or a non-profit entity nor are the Jubers are not in the business of making or refinancing student loans.

In re Reis, 274 B.R. 46 (Bankr. D. Massachusetts 2002). Judge Feeney noted that "case law is sparse on the issue of whether a private student loan made by a family member is excepted from discharge under § 523(a)(8)."

An unpublished District Court decision addresses the issue before this court. London-Marble v. Sterling (Bankr. D. Arizona 2006) affirmed 2008 U.S. Dist. LEXIS 106452 (Dist. Court D. Arizona 2008). Debtor's mother took out PLUS loans for her Debtor son who contracted with his mother to repay the amount borrowed in the PLUS loan and later defaulted. Judge Robert Broomfield addressed whether the loan between the mother and son was an educational loan. Answering the primary issue – whether the loan from Debtor's mother is exempt from discharge under Section 523(a)(8), the Court stated that "it is not the PLUS loan which the Debtor is seeking to discharge, but rather the debt under the contract between two private individuals – a debt separate and apart from the PLUS loan which was [the mother's] obligation."

Judge Broomfield further stated: "Reading the third clause of 523(a)(8) to except from discharge all loans or contracts for educational benefits would render the preceding clauses superfluous" and "clearly the financial integrity of such educational loan programs is not implicated here by discharging a private debt."

In Creeger v. Doyle, 2016 Bankr. LEXIS 2076 (Bankr. N.D. Ohio 2016), Judge Gustafson addresses the educational loan issue with a comparable factual situation. The Debtor was in a dating relationship. There was an oral agreement between the parties that Debtor would repay her lender boyfriend. Several years later, debtor signed a promissory note which did not indicate the loan was an "educational loan."

The scope of 523(a)(8)(A)(ii) vis-a-vi the Congressional policy was the focus of Judge Gustafson's opinion which covered various sub-issues necessary to the understanding of the Congressional intent behind the expansion of § 523(a)(8). His expressed concerns include:

1. "Plain meaning is therefore conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of

4

the drafters" quoting New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492 (3rd Cir. 1996); and

2. A "creditor seeking a judgment of nondischargeability of his claim bears the burden of proof by a preponderance of the evidence that a debt exists and the debt is the type excepted from discharge under 523(a)(8)." Maas v. Northstar Education Finance, Inc. (In re Maas) 497 B.R. 863,869 (Bankr. W.D. Mich. 2013). If the creditor meets the burden, then the debt is only discharged if the debtor establishes the repayment of the debt would constitute undue hardship."

While the majority of courts hold that any loan that can possibly be colored as a student loan is automatically non-dischargeable, this Court must decide whether the circumstances that surround this unique situation render the Oral Loan non-dischargeable under 11 U.S.C. §523(a)(8)(B).

It is only if the Court decides the Oral Loan is non-dischargeable under 11 U.S.C. §523(a)(8)(B) that the question arises as to whether the Promissory Note, which is the subject of this Adversary Proceeding and the basis for the Proof of Claim filed by the Jubers (Claim 2), is also non-dischargeable under 11 U.S.C. §523(a)(8)(B).

### Chapter 3 – The Promissory Note

Although Christopher and Liana were living separate and apart due to Christopher joining the U.S. Navy and being stationed in Norfolk, Virginia, and later Pensacola, Florida, Liana and Christopher continued making monthly payments on the Oral Loan to the Jubers from their joint bank accounts. Payments of approximately $1,000.00 per month plus interest were made up to, and through, November 15, 2015, when the Jubers were advised the engagement was jointly terminated.

Within two (2) days of that announcement, via e-mail on November 17, 2015, Mr. Juber sent the first of three proposed promissory notes that he drafted. The first proposed note attached to the November 17, 2015 e-mail states in part: "Due to the recent circumstances, my future familial relationship with Kevin and Linda Juber…, the actual signatories to the above reference [sic] loan, will no longer exist." The first proposed promissory note further requires Debtor to "acknowledge that I am solely responsible" for the HELOC. The first proposed note further requires Debtor to obtain alternative financing to satisfy the loan balance by no later than December 31, 2015 (44 days). On November 23, 2015, he requested that she sign and return the first proposed promissory note by November 24, 2015.

On November 30, 2015, Mr. Juber e-mailed a second proposed promissory note to Debtor containing terms and conditions far less favorable to the Debtor than those generally understood under the Oral Loan. Debtor had not defaulted on payments to the Jubers at the time this second proposed promissory note was presented. He requested that Debtor "get this signed within the next day or two." (Plaintiff's Exhibits 9 and 10). to Debtor demanding payment of $1,048.12 per month for ten years or until principal, accrued interest, costs and attorney fees were paid in full by electronic transfer, raising the interest rate to 9.5% (approximately triple the Oral Loan rate) including a default penalty rate of 12%, and adding Debtor's father as a guarantor. The Application of Payments provided that the payments would be applied first to costs, fees and other charges, accrued interest and then reduction of the principal balance.

5

On December 2, 2015, Mr. Juber e-mailed a third proposed promissory note ("Promissory Note") to Debtor, requesting the document be signed that night (Plaintiff's Exhibit 12). The Promissory Note included a balloon payment provision not provided for in the second proposed promissory note. Other provisions added include a $100.00 late fee, a provision that the note to be construed according to the laws of Connecticut, obligating Debtor to all costs and expenses relating to the default of the Promissory Note, including attorney fees, and adding Debtor's mother as a guarantor. The distraught Debtor executed this third proposed Promissory Note on December 3, 2015 and returned it to the Jubers unsigned by both of her parents.

It should be noted that without knowledge of the attorneys fees and costs incurred by the Jubers, it is impossible to determine the actual duration of the payments to satisfy the Promissory Note.

The Jubers made it clear that, although they required Debtor to sign a Promissory Note, they were simultaneously researching available unsecured loans for the Debtor to refinance the debt (Plaintiff's Exhibit 14/24 and Plaintiff's Exhibit 16). While this detail in and of itself seems minor, it should be noted that Mrs. Juber is an employee of the University of Connecticut, and it stands to reason that if the Promissory Note would qualify for refinancing through a company in the business of refinancing student loan debt, that Mrs. Juber would have more knowledge than the general population on whether the loan would have qualified to be refinanced as a QEL.

The Promissory Note is the basis for the Jubers' Proof of Claim (Claim 2) filed March 17, 2018 indicating an unsecured claim of $69,136.40 for a "Loan provided to refinance student loans" which totaled approximately $74,433.00 at graduation in 2013 – 4 ½ years of timely payments reduced the balance by approximately $5,000.00. It is the debt of the Promissory Note that the Jubers seek to declare non-dischargeable.

The Jubers unduly influenced Debtor into entering into a Promissory Note during an emotionally vulnerable time by presenting her with three separate proposed promissory notes for signature nearly immediately upon the Debtor informing the Jubers of the dissolution of her marriage engagement to their son. The Jubers capitalized on their parental-type influence over the Debtor, ultimately compelling Debtor to execute the third Promissory Note.

26 U.S.C. 221(d)(1)(C) maintains that indebtedness used to refinance indebtedness which qualifies as a qualified education loan is a student loan, and therefore not dischargeable under 11 U.S.C. § 523(a)(8)(B). Black's Law Dictionary, however, defines the act of refinancing thus: "This term refers to acquiring a new, larger loan that retires an older, smaller loan over a longer term, using the same assets as collateral."  As the term of the HELOC provided a maturity date of November 24, 2039 – 13 years, 11 months, and 4 days prior to the December 20, 2025 maturity date of the Promissory Note -- the Jubers' argument that this debt is a refinance per 26 U.S.C. 221(d)(1)(C) is misguided.

## Chapter 4 – Were the loans treated as QELs?

At no time from the inception of the Oral Loan, to the filing of this Chapter 13 proceeding, did the Jubers treat the Oral Loan or the Promissory Note as a qualified student loan, and at all times were both the Oral Loan and Promissory Note treated as family and/or personal obligations:

1. The Oral Loan was made because Debtor was Kip's fiancée and soon-to-be family.

2. The Oral Loan was a very causal agreement with minimal documentation, despite Mr. Juber being an experienced businessman and Mrs. Juber a grants and contracts specialist with the University of Connecticut.

3. The Jubers inserted a surprise "default provision" in the Oral Loan upon the engagement termination and required Debtor provide a replacement Promissory Note with less favorable terms to the Debtor, which indicates the motivation was personal as Debtor was current on her loan payments.

4. The Jubers are not licensed student loan servicers in the state of Connecticut.

5. The Jubers failed to comply with the duties of a student loan servicer in information reporting of interest for qualified education loans per 26 C.F.R. §1.6050S-3.

6. The Jubers failed to provide disclosures required of student loan servicers private education loans per 12 C.F.R. §1026.46 and 12 C.F.R. §1026.47.

7. The Jubers failed to provide disclosures to Debtor, a taxpayer under 26 U.S.C. §221(d)(1), that would allow her to take the 1098-E interest deduction she would be allowed on her 2015, 2016, and 2017 tax returns if the Juber loan were actually a qualified student loan. The Debtor was unaware she could claim an interest deduction on this loan, as it was believed to be a strictly personal loan.

8. The Jubers likely claimed the benefit of the mortgage interest paid by Debtor on the HELOC for the Oral Loan.

## Conclusion

Caselaw is minimal with regard to the fact-specific situation presented to the Court by the Juber's double-barreled Adversary Proceeding and Objection to Confirmation. The available caselaw, coupled with the circumstances surrounding the Promissory Note is sufficient, however, to rebut the Jubers position and deny their Objection to Dischargeability.

While it has been found that the Debtor's original Private Student Loans are qualified education loans, the Court must determine whether the subsequent loan transactions maintain the status of a non-dischargeable qualified education loan, given the unique circumstances surrounding the matter at hand.

A simple view of the Chapter 13 filing by the Debtor would likely indicate an ability and willingness to pay the initial (conditionally confirmed) Chapter 13 Payment which includes her federal student loan obligations. Ms. Conklin has not raised the "undue hardship" issue as her filed schedules indicate her net monthly income from her full-time and part-time employment allows her the ability to pay a dividend to her general unsecured creditors.

Although she has eligibility to convert this proceeding to a Chapter 7, Ms. Conklin desires to pay her dischargeable, general unsecured debts to the best of her ability. Ms. Conklin's desire to pay her creditors as set forth in her Chapter 13 Plan is heavily impacted by the substantial costs of

defending herself from a claimant who would be precluded from seeking to deny the discharge of the debt due to being formally "family" per 26 U.S.C. § 221(d)(1)(c) if the wedding (and transition from "daughter" to "DAUGHTER") had not been cancelled mere weeks before the event, to the detriment of other Chapter 13 creditors except the Federal loans.

Failure to find the Promissory Note a dischargeable, general unsecured Oral Loan based upon a simple personal transaction would present a financial situation that would likely prolong the Debtor/Creditor relationship with the Jubers by an additional decade if the Court denies the Debtor's Discharge of the Juber loan.


Dated: _____    \_\_\_\_\_/s/_____
David R. Badger
N.C. State Bar #156
DAVID R. BADGER, P.A.
Attorney for Debtor
325 Arlington Avenue, Suite 550
Charlotte, North Carolina 28203
Telephone:    (704) 375-8875
Facsimile:    (704) 375-8835

8

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN RE:<br><br>LIANA SUE CONKLIN<br><br>      Debtor. | Case No.: 18-30263<br><br>Chapter 13 |
| Kevin Juber et al.<br>      Plaintiffs,<br><br>vs.<br><br>Liana Sue Conklin<br>      Defendant. | Adversary Proceeding: 18-03026 |

**CERTIFICATE OF SERVICE**

  The undersigned certifies that he has this date served a copy of the **Brief in Support of Defendant Liana Sue Conklin** on all parties listed below by depositing same with the United States Postal Service, postage pre-paid and addressed as follows:

Liana S. Conklin
7510 Turley Ridge Lane
Charlotte, NC 28273


  The undersigned further certifies that he has this date served a copy of the **Brief in Support of Defendant Liana Sue Conklin** on all parties who have requested electronic service in this case through the Court's electronic noticing system, including the U.S. Bankruptcy Administrator's Office, Diana A. Saffa, Attorney for Debtor, and Heather W. Culp, Attorney for Plaintiff.


Dated: _____

                  _____
                  David R. Badger
                  N.C. State Bar #156
                  DAVID R. BADGER, P.A.
                  Attorney for Debtor
                  325 Arlington Avenue, Suite 550
                  Charlotte, North Carolina 28203
                  Telephone:  (704) 375-8875
                  Facsimile:  (704) 375-8835