FILED & JUDGMENT ENTERED
Steven T. Salata

August  26  2019

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_Laura T Beyer_
Laura T. Beyer
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **LIANA SUE CONKLIN,** | ) | Chapter 13 |
| | ) | Case No. 18-30263 |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| **KEVIN JUBER and LINDA JUBER,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 18-3026 |
| | ) | |
| **LIANA SUE CONKLIN,** | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
### GRANTING JUDGMENT TO THE DEFENDANT

This case involves uncommon factual circumstances and the application of a deceptively simple statutory scheme that raises as many questions as it answers. The facts epitomize how the best of intentions can get off track and how a simple, personal loan made between two parties can lead to a complicated dispute over the dischargeability of that debt when one of the parties later files for bankruptcy. Based on the facts and testimony presented

at trial, the court concludes that the funds that Kevin and Linda Juber (the "Jubers") loaned their son's then-fiancé, Liana Conklin (the "Debtor"), to enable her to pay off her private student loans, constitute a dischargeable debt that the Debtor may treat as a general unsecured claim in her Chapter 13 plan.

## Findings of Fact

1.   Despite the fact that this matter came on for trial, the parties were largely in agreement about the facts.  Nonetheless, the landscape in which this dispute arose and the factual nature of the loan at issue are crucial to this court's ultimate determination regarding the dischargeability of the debt.

2.   The Debtor's story begins much like any other college student.  The Debtor began attending college at the University of New Haven in the fall of 2009.  Transcript of Trial at 102, Juber v. Conklin, No. 18-3026 (Bankr. W.D.N.C. Apr. 1, 2019), ECF No. 40 [hereinafter Transcript].  The Debtor financed her studies with student loans from the Department of Education; private student loans from three different loan providers (the "Three Original Loans"); other grants; and scholarships from the university. Transcript of Deposition of Liana Sue Conklin at 12, Juber v. Conklin, No. 18-3026 (Bankr. W.D.N.C. July 23, 2018), ECF No. 8. While at the university, the Debtor began dating the Jubers' son, Christopher "Kip" Juber (the "Jubers' Son").  Transcript at 102. In the spring of 2013, the Debtor graduated from college, id. at

11, and she and the Jubers' Son became engaged in December of 2014. Transcript at 103.

3.    Around the time of the engagement, and after the Debtor graduated, the Jubers learned about the nature and extent of the Debtor's Three Original Loans.  Transcript at 10—11.  At trial, Mr. Juber testified that he and his wife were concerned because "[o]nce Christopher and [the Debtor] became engaged" they would form a household "and any incomes both had would, effectively, be contributing to that household."  Transcript at 13.  The Jubers "always tried to . . . position [their] children to start somewhat free of debt in order to be able to afford a house, or just not have a lot of financial burden over them."  Transcript at 11.  To that end, Mr. Juber inquired about the specifics of the Three Original Loans, ultimately sparking a conversation about the parents helping both their son and the Debtor with the loans. Transcript at 105—06.  The Jubers' Son first discussed the details of the offer with his parents, Transcript at 107, and ultimately brought the Debtor into the conversation through a phone call amongst the four of them. Transcript at 13—14, 108—09.  This call took place approximately one month after the couple became engaged. Transcript at 13, 106.  It was during this phone conversation that the Jubers explained their plan to assist the couple.  Transcript at 13—16.  The Debtor did not approach the Jubers about providing this loan or suggest that she was unable to make her payments on

the Three Original Loans. Transcript at 106—08. In fact, according to Mr. Juber, the Debtor had a history of making her payments on the Three Original Loans without difficulty. Transcript at 54. It was upon the Jubers' suggestion that the Debtor and the Jubers' Son considered allowing his parents to pay off the loans. Transcript at 107—08, 137.

4. The Jubers' offer to the Debtor was twofold. First, the Jubers planned to activate their home equity line of credit (the "HELOC") to pay off the Three Original Loans. Transcript at 108. The Jubers understood that the weighted average of the interest rates on the Three Original Loans was around 9.5% while the interest rate on the HELOC was only 1.99%. Transcript at 12. The Jubers believed that by paying off the Debtor's Three Original Loans with the HELOC, the Debtor and their son would benefit from the lower interest rate and be able to have a lower principal balance when they married. Transcript at 13, 16. In return, the Jubers asked the Debtor to agree to pay $500 biweekly until they decided to sell their home (the "Oral Loan"). Transcript at 18. The Jubers planned to sell their home in the near future and would ultimately need to pay off the HELOC prior to closing. Transcript at 19-20, 31. As such, at the end of this roughly twelve-month term, the Jubers understood that the Debtor and their son, together, would refinance the remaining principal, albeit significantly reduced by the Oral Loan. Transcript at 12, 18.

4

Specifically, this transaction would occur after the Debtor and the Jubers' Son wed, and the Jubers assumed that their son would need to cosign on the debt. Transcript at 19, 44.

5.   Throughout the trial, the parties testified that the purpose of the Oral Loan was to allow any net income that either the Debtor or the Jubers' son earned during the course of that year to be committed to paying off the principal of the loan. Transcript at 16, 108. Mr. Juber testified that he was "not in the business of providing loans," Transcript at 68, and the couple's pending engagement was "100%" the reason he offered the loan to the couple. Transcript at 20. He wanted the couple to have a stable financial situation as they began their married life together. Transcript at 75.

6.   The parties never contemplated the fate of the Oral Loan in the event that the engagement of the Debtor and the Jubers' Son fell through. Alas, the Debtor called off the engagement in November of 2015, Transcript at 126, which triggered a litany of email exchanges between the Debtor, the Jubers, and the Jubers' Son about how to handle the Oral Loan after the engagement ended, see Plaintiffs' Exs. 6—9, 13—14, 16—18, 21—22, 26—32. Mr. Juber explained that payment of the Debtor's student debts would "no longer . . . be affecting [the Juber's] [S]on's household, [so they] wanted to try and just distance [themselves]." Transcript at 36—37.

7.   To that end, the Jubers asked the Debtor to sign a written promissory note for the debt she owed pursuant to the Oral Loan.  Transcript at 53—54; see Plaintiffs' Ex. 11.  The Jubers, the Debtor, and the Debtor's parents exchanged multiple versions of a promissory note via email correspondence.  Transcript at 38—54; see Plaintiffs' Exs. 7—14, 16—18, 26—32.  On more than one occasion, the email records reveal that the Debtor sought advice from her parents, Transcript at 143—48, and requested changes in the proposed promissory note's terms from the Jubers, see Plaintiffs' Exs. 6—13, 14, 16, 17, 18, 21, 22, 26—32.  The Jubers honored each of the Debtor's requests.  Transcript at 38—50; see Plaintiffs' Exs. 7, 10—13, 26—28, 30, 32.  Interestingly, the first version of the proposed promissory note included a provision that referred to the "educational purposes" of the Three Original Loans.  Transcript at 94; Plaintiffs' Ex. 7.  However, the final version of the promissory note (the "Promissory Note"), which was attached to the Jubers' proof of claim, neither made reference to the loan as an educational loan, a student loan, or a Qualified Education Loan nor suggested that the Oral Loan had any educational purpose.  Plaintiffs' Ex. 12. Mr. Juber testified that he was not familiar with the term "Qualified Education Loan" when he asked the Debtor to sign the Promissory Note.  Transcript at 68—69, 81.

8.   The terms of the Promissory Note were different than the terms of the Oral Loan.  Under the Promissory Note, the Debtor

would repay the Jubers over a ten-year term at an interest rate of 9.5%, the weighted average interest rate of the Three Original Loans.  Transcript at 85; Plaintiffs' Exs. 12—13.  The Promissory Note contained signatory lines for both the Debtor and the Debtor's parents but was only signed by the Debtor and was neither cosigned nor secured by any of the Debtor's collateral.  Transcript at 55, 143; Plaintiffs' Ex. 12.

9.   The Debtor made relatively timely payments under the Promissory Note for two years following its execution.  Transcript at 56—57; 59—60.  During those two years, the Jubers did not prepare or send to the Debtor copies of IRS Form 1098-E, the declaration of interest paid on a student loan that student loan providers issue to borrowers.  Transcript at 63—64.  In fact, the Jubers did not prepare these forms until their bankruptcy counsel instructed them to do so when they filed this adversary proceeding. Id.   The Debtor made full payments to the Jubers under the Promissory Note through January 2018.  Transcript at 59.

10.  On February 20, 2018, the Debtor filed a Chapter 13 bankruptcy petition.  The Jubers commenced this adversary proceeding on April 25, 2018 seeking to classify the Debtor's indebtedness, as represented by the Oral Loan and the subsequent Promissory Note, as nondischargeable debt incurred as a refinance of a qualified education loan under § 523(a)(8) of the Bankruptcy Code and § 221(d) of the Internal Revenue Code.

7

## Procedural History

11.  When the Debtor commenced her case on February 20, 2018, she also filed a Chapter 13 plan.  The Debtor listed a student loan payment to FedLoan Servicing that she planned to pay directly but did not separately classify or otherwise list any student loans that would be dealt with through her plan as long-term debts.  On March 17, 2018, the Jubers filed a proof of claim in the Debtor's case for $69,136.40.  The Jubers explained that the basis of their claim was a "[l]oan provided to refinance student loans."  About two months later, the Jubers filed an Objection to Confirmation of the Debtor's plan as well as this adversary proceeding.  The basis of both their objection and this adversary is the alleged non-dischargeability of the Oral Loan and the subsequent Promissory Note.  Specifically, in the context of their objection, the Jubers contend that the Debtor cannot discharge her debt to them because, pursuant to 11 U.S.C. §§ 523(a)(8)(B) and 1328(a)(2), the debt is "indebtedness . . . used to refinance indebtedness which qualifies as a qualified education loan" under § 221(d) of the Internal Revenue Code.  <u>See</u> Objection to Confirmation at 1, <u>In re Conklin</u>, No. 18-30263 (Bankr. W.D.N.C. Apr. 24, 2018), ECF No. 16.  The Jubers argue that the Debtor's plan violates the provisions of Chapter 13 and was not proposed in good faith because it proposes to pay the Jubers "only pro rata as an [sic] non-priority unsecured claim that is not separately classified as a long-term debt."  <u>Id.</u>

Following a hearing on the Jubers' Objection to Confirmation, the court confirmed the Debtor's plan subject to a ruling in this adversary proceeding as to the treatment of the Oral Loan and the Promissory Note. Order Confirming Plan at 1, In re Conklin, No. 18-30263 (Bankr. W.D.N.C. Aug. 18, 2018), ECF No. 30.

12. Shortly after the conditional confirmation, the Jubers filed Plaintiffs' Motion for Partial Summary Judgment that sought to establish that the Debtor's Three Original Loans were "qualified education loans" as defined in § 221(d)(1) of the Internal Revenue Code. Plaintiffs' Motion for Partial Summary Judgment at 1, Juber v. Conklin (In re Conklin), No. 18-3026 (Bankr. W.D.N.C. Oct. 3, 2018), ECF No. 11. In order for the Jubers to establish that the Oral Loan and the Promissory Note were refinanced student loans, they had to first establish that the Three Original Loans were qualified education loans under 11 U.S.C. § 523(a)(8)(B). Following briefing and a hearing on the Plaintiffs' Motion for Partial Summary Judgment, the court entered the Order Granting Plaintiffs' Motion for Partial Summary Judgment on December 3, 2018. This order concludes that the Three Original Loans were qualified education loans. Order Granting Plaintiffs' Motion for Partial Summary Judgment at 5, Juber v. Conklin (In re Conklin), No. 18-3026 (Bankr. W.D.N.C. Dec. 3, 2018), ECF No. 21.

13. This adversary proceeding then proceeded to trial on January 25, 2019 on the issue of whether the Oral Loan to the

Debtor was nondischargeable pursuant to § 523(a)(8)(B) as a refinance of the Three Original Loans—three qualified education loans. While some of the features of the Promissory Note were instructive in deciding this issue, the court's focus remained on the Oral Loan given that it was the original representation of the agreement between the parties. For all of the reasons stated on the record and as explained in this written opinion, the court concludes that the Oral Loan to the Debtor is dischargeable and will be treated as a general unsecured claim in the Debtor's Chapter 13 case.

## Conclusions of Law

14.   While the parties agreed, in large part, about the facts of this case, the same cannot be said about the application of those facts to the law at issue—largely because there is no case factually on point with the one before this court.   In general, there is little case law interpreting § 523(a)(8)(B).

15.   The provision of the code at issue in this case is 11 U.S.C. § 523(a)(8)(B).   Section 523(a)(8) outlines several categories of student debt that may be excluded from discharge, including any debt for:

> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

> (B) any other educational loan that is a
> qualified education loan, as defined in
> section 221(d)(1) of the Internal Revenue Code
> of 1986, incurred by a debtor who is an
> individual.

Section 221(d)(1) of the Internal Revenue Code defines a "qualified

education loan" as:

> any indebtedness incurred by the taxpayer
> solely to pay qualified education expenses—
>  (A)    which are incurred on behalf of the
> taxpayer . . . as of the time the
> indebtedness was incurred,
>  (B)    which are paid or incurred within a
> reasonable period of time before or after
> the indebtedness is incurred, and
>  (C)    which are attributable to education
> furnished during a period during which the
> recipient was an eligible student.

> Such term includes indebtedness used to
> refinance indebtedness which qualifies as a
> qualified education loan. The term "qualified
> education loan" shall not include any
> indebtedness owed to a person who is related
> (within the meaning of section 267(b) or
> 707(b)(1)) to the taxpayer . . . .

26 § U.S.C. 221(d). "[T]he initial burden is on the lender to

establish the existence of the debt and to demonstrate that the

debt is included in one of the four categories enumerated in

§ 523(a)(8)." Rumer v. Am. Educ. Servs. (In re Rumer), 469 B.R.

553, 561 (Bankr. M.D. Pa. 2012) (citations omitted).[1]  But cf.

Skipworth v. Citibank Student Loan Corp. (In re Skipworth), Nos.

---

[1] In outlining the four categories of dischargeable student debt under
§ 523(a)(8), the Rumer court's fourth category does not accurately state the
text of § 523(a)(8)(B)—it leaves out the first six words: "any other educational
loan that is." Doyle v. Creeger (In re Creeger), Nos. 14-34053, 15-3023, 2016
WL 3049972, at *3 (Bankr. N.D. Ohio May 20, 2016) (citing In re Oliver, 499
B.R. 617, 622–23 (Bankr. S.D. Ind. 2013)); see Rumer, 469 B.R. at 561.

09–83984, 09–80149, 2010 WL 1417964, at *2 (Bankr. N.D. Ala. Apr. 1, 2010) (noting that it was the debtor who failed to meet his burden on the issue of whether the loan was a student loan).

16.   While the court acknowledges that, at first blush, the Oral Loan may appear to fall within the language of § 221(d), such a reading is contrary to longstanding canons of statutory interpretation, the public policies that motivated the passage of § 523(a)(8), and the legislative history surrounding § 523(a)(8). The court reached this conclusion by (I) interpreting the plain meaning of § 523(a)(8)(B), (II) reviewing the public policy considerations and legislative history of § 523(a)(8), and (III) employing the "substance of the transaction" test used by many courts in analyzing cases under § 523(a)(8)(A), the sister provision to the one at issue.

I.   The Oral Loan is not an "Educational Loan"

17.   The court begins its analysis by examining the plain language of the statute in question: 11 U.S.C. § 523(a)(8)(B). "The starting point for interpreting a statute is the language of the statute itself." London-Marable v. Sterling, Nos. CIV 06-CV-2659, BK-5-4339, 06-00274, 2008 WL 2705374, at *5 (D. Ariz. July 9, 2008) (quoting Thorson v. Cal. Student Aid Comm'n (In re Thorson), 195 B.R. 101, 104 (B.A.P. 9th Cir. 1996)). "Bankruptcy provisions will be interpreted according to their plain meaning except in the rare cases [in which] the literal application of a

statute will produce a result demonstrably at odds with the
intention of its drafters." Id. (alteration in original) (quoting
Leonard v. St. Rose Dominican Hosp. (In re Majewski), 310 F.3d
653, 656 (9th Cir. 2002)).  The Supreme Court has said that courts
must give meaning and effect to every clause and word of a statute,
see Negonsott v. Samuels, 507 U.S. 99, 106 (1993) (quoting Moskal
v. United States, 498 U.S. 103, 109–10 (1990)), and must look not
only at a particular clause but also the language and design of
the statute as a whole, Dada v. Mukasey, 554 U.S. 1, 16 (2008)
(citations omitted).  "When the statute's language is plain, the
sole function of the court—at least where the disposition required
by the text is not absurd—is to enforce it according to its terms."
In re McLain, 376 B.R. 492, 494 (Bankr. D.S.C. 2007) (quoting Lamie
v. U.S. Tr., 540 U.S. 526, 534 (2004)). With respect to exceptions
to discharge, "it is axiomatic that exceptions to discharge 'should
be confined to those plainly expressed,' and construed narrowly
against the creditor."  Campbell v. Citibank (In re Campbell), 547
B.R. 49, 54 (Bankr. E.D.N.Y. 2016) (quoting Kawaauhau v. Geiger,
523 U.S. 57, 62 (1998)); see Hawkins v. Franchise Tax Bd., 769
F.3d 662, 666 (9th Cir. 2014) ("[T]he Supreme Court has interpreted
exceptions to the broad presumption of discharge narrowly."
(citing Kawaauhau, 523 U.S. at 62)).  Still, while the plain text
of the statute is of utmost importance, "that does not mean that
a court must read the words with blinders on."  Golden v. JP Morgan

13

Chase Bank (In re Golden), 596 B.R. 239, 260 (Bankr. E.D.N.Y. 2019). "[I]t is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " Id. (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989)).

18.  The plain language of § 523(a)(8)(B) excepts from discharge "any other educational loan that is a qualified education loan." At least one court analyzing the dischargeability of loans under § 523(a)(8)(B) has noted that "not every debt that is incurred by a student in pursuit of an education is, without more, a nondischargeable 'student loan.' " Id. at 269. "Section 523 must be applied in a way that provides discernable boundaries" between those debts that are dischargeable and those that are not. Id.  The Bankruptcy Court for the Southern District of Indiana contemplated the boundaries in In re Oliver, 499 B.R. 617 (Bankr. S.D. Ind. 2013).

19.  In Oliver, a student signed up to take classes at a local university. Id. at 619.  The student received a number of grants and student loans to pay for her classes early on in the semester. Id. at 620.  Nonetheless, as class costs were added to her student tuition account and her grant and loan money depleted, Oliver owed a balance for the remaining tuition on two of her classes.  Id. Oliver ultimately withdrew from the classes for which she owed

tuition, leaving an outstanding balance in her student tuition
account. Id. She later filed for bankruptcy under Chapter 7 and
sought to have the debt she owed to the university discharged.
Id. at 621—22. Among the issues before the Oliver court was
whether the unpaid balance for tuition constituted an "educational
loan" pursuant to § 523(a)(8)(B). Id. at 621. The university
maintained that the language in the "qualified education loan"
provision of § 523(a)(8)(B) covered this type of debt and made the
account nondischargeable. Id. Conversely, the Debtor argued that
her balance with the university was not an "educational loan" at
all and the debt was dischargeable. Id.

    20. The Oliver court began by looking at the history of
§ 523(a)(8) as laid out, more thoroughly, in In re Chambers, a
2003 case from the Seventh Circuit, that had facts analogous to
those in Oliver. Id. at 621-22 (citing In re Chambers, 348 F.3d
650, 652-58 (7th Cir. 2003)). In Chambers, the court found that
an unpaid balance on a student account was not a loan at all, so
it was dischargeable under § 523(a)(8). Chambers, 348 F.3d at
658. The Oliver court highlighted that Chambers "expressly left
to Congress the opportunity 'to protect any educational "extension
of credit" ' " and expand the statute if it so chose. Oliver, 499
B.R. at 622 (quoting Chambers, 348 F.3d at 657).

    21. The Oliver court explained that while "Congress ha[d]
progressively expanded the reach of § 523(a)(8)" with BAPCPA to

exclude more student loans from discharge, it had not added the language of § 523(a)(8)(B) simply to exclude from discharge any and every debt with a connection to education, regardless of how tenuous the connection might be.  Id. at 623.  Instead, "Congress retained the phrase 'any other educational loan that is' " as the introductory clause to § 523(a)(8)(B).  Id.  Oliver gives weight to the retention of these six words post-BAPCPA and says courts cannot simply jump to the definition of § 221(d)(1) in deciding if a debt is nondischargeable.  Id. at 622—23.  The Oliver court expounded:

> "[A]ny other educational loan" is a "set," and of all the types of loans that may fall thereunder, only the "subset" of "qualified education loans" falls within the exception to discharge.  Said another way, there is a two-tiered analysis: first, whether a debt is an educational "loan" and, if it is, then whether it meets the Internal Revenue Code definition of "qualified education loan."

Id. at 623 (emphasis omitted).  Oliver concludes that even with the BAPCPA amendments, the plain language of § 523(a)(8)(B) requires a court to decide if the debt at issue is an educational loan "before it analyzes whether the [d]ebt is a 'qualified education loan' " under § 221.  Id. at 624; see Hazelton v. UW-Stout, No. 18-cv-159, 2019 WL 413567, at *2 (W.D. Wis. Feb. 1, 2019) ("Because § 523(a)(8)(B) states that a 'qualified education loan' is simply one type of 'other education loan,' a debt cannot satisfy the definition in § 221(d)(1) unless it first qualifies as

an 'educational loan' as a general matter within the meaning of . . . [§ 523](a)(8)(B).”); <u>D'Youville College v. Girdlestone (In re Girdlestone)</u>, 525 B.R. 208, 211 (Bankr. W.D.N.Y. 2015) (“Under the Bankruptcy Code, nondischargeability extends not to any such 'qualified education loan,' but only to 'any other educational loan that is a qualified education loan.' ”); <u>see also</u> <u>Wiley v. Wells Fargo Bank, N.A. (In re Wiley)</u>, 579 B.R. 1, 10 (Bankr. D. Maine 2017) (discussing the requirements of § 221(d)(1)).

22.   Here, the Jubers argue that § 523(a)(8)(B) and § 221(d) apply to the Oral Loan because it was indebtedness used to refinance a qualified education loan pursuant to § 221(d).   The Jubers focus on the fact that their extension of credit to the Debtor appears to meet the § 221(d) requirements.   The court, however, does not need to decide if the Oral Loan was a refinance of the Three Original Loans if the Oral Loan, itself, does not overcome the threshold language of § 523(a)(8)(B) as outlined by the <u>Oliver</u> court.

23.   The issue of whether the Oral Loan is an “educational loan” is, in and of itself, a two-part question: Was this a loan, and if so, was it an “educational” loan?   <u>See</u> <u>Alibatya v. New York University (In re Alibatya)</u>, 178 B.R. 335, 338 (Bankr. E.D.N.Y. 1995) (“The term 'educational' is merely an adjective describing 'loan.' ”).   The Bankruptcy Code does not include a definition of an “educational loan.”   <u>Gorosh v. Posner (In re Posner)</u>, 434 B.R.

800, 803 (Bankr. E.D. Mich. 2010).   The parties do not dispute that the funds provided by the Jubers to pay off the Three Original Loans constituted a loan.   Therefore, the pertinent issue is whether the loan was educational in character and nature.   "[T]he character of a loan should dictate how it is treated."   United Student Aid Funds v. Flint (In re Flint), 238 B.R. 676, 680 (E.D. Mich. 1999) (citing Santa Fe Med. Servs., Inc. v. Segal (In re Segal), 57 F.3d 342, 349 (3d Cir. 1995)); see Lapusan v. Educ. Credit Mgmt. Corp. (In re Lapusan), 244 B.R. 423, 424 (Bankr. S.D. Ill. 2000) (citing Flint, 238 B.R. at 680—81); George Washington Univ. v. Pelzman (In re Pelzman), 233 B.R. 575, 580 (Bankr. D.D.C. 1999) (recognizing that a loan was an educational loan when it was "intended to allow the debtor to meet those expenses incidental to her obtaining an education" and was "plainly designed to facilitate the debtor's education").

24.   This court is hard-pressed to find a case that describes what establishes the "educational" character of a loan under § 523(a)(8)(B).   The nature of funds advanced to students is usually challenged under § 523(a)(8)(A), not § 523(a)(8)(B). See, e.g., Busson-Sokolik v. Milwaukee School of Eng'g (In re Sokolik), 635 F.3d 261, 266 (7th Cir. 2011); Brown v. Rust (In re Rust) 510 B.R. 562, 567 (Bankr. E.D. Ky. 2014). The case law exploring "educational" loans under § 523(a)(8) typically examines how students spend loan money or assesses consolidation loans, sought

out by borrowers, in hopes of securing better loan terms or rates. See generally Dufrane v. Navient Sols., Inc. (In re Dufrane), 566 B.R. 28, 36-39 (Bankr. C.D. Cal. 2017). This case is different.

25. Here, the Jubers were not extending credit, as an institutional lender would, to fund an education by paying for tuition, housing expenses, books, technology fees, meal plans, study-abroad, and the like. Unlike the lender in Pelzman, 233 B.R. at 580, the Jubers did not aim to facilitate the Debtor's education or allow the Debtor to pay for costs incidental to her education. Instead, the Oral Loan was personal in nature. It was extended to the Debtor as a means of helping the Juber's Son. At trial, Mr. Juber testified that the loan was made so that his son and future daughter-in-law could start their marriage on the right foot. Mr. Juber admitted that the loan would benefit both his son and the Debtor and would help their financial situation in the long run. The Debtor did not seek the loan from the Jubers. Rather, the Jubers approached the Debtor about this opportunity and framed the offer as one to benefit the pending marriage. The Oral Loan was the Jubers' good-hearted, albeit misguided, attempt to get rid of debt their son could ultimately be responsible for upon marriage. It was not educational in nature.

26. Other provisions of § 523(a)(8) acknowledge that not all monies provided to a student that ultimately pay for an education are "educational loans." For example, § 523(a)(8)(A)(i) excepts

loans by non-profits and the government only when they are made
for an "educational benefit." Similarly, § 523(a)(8)(A)(ii)
emphasizes that only those obligations to repay educational
benefits, scholarships, or stipends are nondischargeable. Golden,
596 B.R. at 269—270. Courts interpreting § 523(a)(8)(A)(ii)
contemplate the difference between a standard consumer loan,
traditional student loans, and other monies that bestow an
educational benefit. Homaidan v. SLM Corp. (In re Homaidan), 596
B.R. 86, 102 (Bankr. E.D.N.Y. 2019) (explaining that
§ 523(a)(8)(A)(ii), "both by its terms and read in context, does
not sweep in all education-related debt, or all loans that support
a student's efforts to gain the benefits of an education"); Golden,
596 B.R. at 265 ("[Section 523(a)(8)(A)(ii)] does not include *all*
debt that confers the benefits of an education on the borrower.").
These courts examine if the educational benefit at issue lacks the
"traditional characteristics of 'educational loans.'" Golden,
596 B.R. at 268.

27. Homaidan warns against extending nondischargeability to
loans that lack these traditional characteristics. Homaidan, 596
B.R. at 102 ("It is hard to see where [this argument] would end—
conceivably, it would encompass credit card debt that was incurred
to purchase textbooks, personal loans that were used to pay for
tuition and school fees, and any other debt that, in one way or
another, facilitated a student's efforts to gain the 'benefits' of

an education."). <u>Homaidan</u> says "that is not what Section 523(a)(8)(A)(ii) encompasses, or what the Bankruptcy Code permits, or what Congress intended." <u>Id.</u>

28. The Oral Loan lacks all of the traditional characteristics of a student loan and is more like the credit card debt and personal loans that <u>Homaidan</u> concludes are dischargeable under § 523(a)(8)(A)(ii). It had an incredibly low interest rate and the extension of credit came after the Debtor completed her education or had a need for student financing.  In addition, the Oral Loan and Promissory Note made no mention of the Debtor's student status or the fact that it dealt with funds used towards an education. The court heeds the cautionary language found in <u>Homaidan</u>. Based on the statutory language as interpreted by the relevant case law, the Oral Loan was not an educational loan within the meaning of § 523(a)(8)(B).

II.   <u>Legislative History and Public Policy</u>

29. "Another factor which augurs in favor of a finding that the subject debt is not exempt from discharge" is the legislative history, <u>London-Marable</u>, 2008 WL 2705374, at *6, and the public policy initiatives that create the backdrop to § 523(a)(8). "The Bankruptcy Code was drafted to provide a discharge procedure that enables insolvent debtor's [sic] to reorder their affairs and start a new life without the pressure and discouragement of pre-existing debt." <u>Posner</u>, 434 B.R. at 803 (citation omitted).  One goal of

the discharge provisions is to protect "the honest but unfortunate debtor's right to a fresh start." Lamento v. U.S. Dep't of Educ. (In re Lamento), 520 B.R. 667, 675 (Bankr. N.D. Ohio 2014) (citing Posner, 434 B.R. at 803). Nonetheless, Congress chose to "exclude certain obligations from the general policy of discharge where the public policy at issue outweighs [a] debtor's need for a fresh start." Posner, 434 B.R. at 803 (citing In re Pelkowski, 990 F.2d 737, 744 (3d Cir. 1993)). "[I]n the case of section 523(a)(8), Congress has revealed an intent to limit the dischargeability of educational loan debt, and [a court] can construe the provision no more narrowly than the language and legislative history allow." In re Pelkowski, 990 F.2d 737, 745 (3d Cir. 1993). As such, 11 U.S.C. § 523(a)(8) limits the "ability of students to discharge educational loans to protect the financial integrity of educational loan programs." Posner, 434 B.R. at 803 (citing Pelkowski, 990 F.2d at 743).

30. "[E]ducational loans are different from most loans. They are made without business considerations, without security, without cosigners, and relying for repayment solely on the debtor's future increased income resulting from the education." U.S. Dep't of Health and Human Servs. v. Smith (In re Smith), 807 F.2d 122, 125 (8th Cir. 1986) (alteration in original) (quoting H.R. REP. NO. 95-595, at 133 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6094). "[U]nlike commercial transactions where credit is extended based

on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation." Andrews Univ. v. Merchant (In re Merchant), 958 F.2d 738, 740 (6th Cir. 1992) (citing H.R. REP. NO. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787). "Although limited, the legislative history of section 523(a)(8) teaches that the exclusion of educational loans from the discharge provisions was designed to remedy abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing for bankruptcy shortly after graduation." Santa Fe Med. Servs., Inc. v. Segal (In re Segal), 57 F.3d 342, 348 (3d Cir. 1995) (citations omitted); see generally Essangui v. SLF V-2015 Tr. (In re Essangui), 573 B.R. 614, 617-20 (Bankr. D. Md. 2017) (reviewing the legislative history of 11 U.S.C. § 528(a)(8)).

31. In essence, by making student loans nondischargeable in bankruptcy, Congress believed lenders would be incentivized to "lend to borrowers who could not qualify for loans under traditional underwriting standards." Posner, 434 B.R. at 803 (citing Pelkowski, 990 F.2d at 743). It is unequivocally clear that "Congress enacted 11 U.S.C § 523(a)(8) in an effort to prevent abuses in and protect the solvency of the educational loan programs." Merchant, 958 F.2d at 742 (discussing a prior version

of § 523(a)(8)); <u>Doyle v. Creeger (In re Creeger)</u>, Nos. 14–34053, 15–3023, 2016 WL 3049972, at *8 (Bankr. N.D. Ohio May 20, 2016) (citing <u>Merchant</u>).  "The policy considerations underlying 11 U.S.C. § 523(a)(8) necessarily limit the parties who may take advantage of the statute's protections." <u>Posner</u>, 434 B.R. at 803.

32.  Here, the Jubers would have the court find that Congress intended 11 U.S.C. § 523(a)(8) to protect lenders like them.  To the Jubers, it does not matter that they would have lent to the Debtor regardless of the prospects of repayment or that their loan was not educational in nature. The Jubers ask the court to ignore the fact that they are not a bank, a governmental institution, or some other organization regularly engaged in the extension of credit to students.  Further, they urge the court to look past the fact that they reached out to the Debtor and offered favorable terms to her and, more importantly, to their son.  The Jubers are not the type of lenders that Congress intended to protect when they considered the backbone of the student lending infrastructure nationwide.  The <u>Creeger</u> court wrestled with a similar situation.

33.  In <u>Creeger</u>, the plaintiff and the debtor were in a dating relationship.  <u>Creeger</u>, 2016 WL 3049972, at *2.  Creeger was studying at the University of Toledo on a student visa and, as such, she was not eligible for "qualified student loans."  <u>Id.</u> Moreover, she was not a citizen of the United States, so she had insufficient credit history to obtain personal loans to pay for

her education.  Id.  Thus, the plaintiff chose to fund Creeger's education for her, and he made payments to the school on her behalf so that Creeger could obtain a degree.  Id.  It was understood that the plaintiff's payments directly to the university were a loan to Creeger that would eventually need to be repaid in full. Id.  Ultimately, the parties converted the debt owed under their oral agreement to a promissory note, although the note "was void of any language referring to the balance due as being derived from an educational loan, qualified or otherwise."  Id.  Creeger filed for bankruptcy, and the plaintiff sought to have his loan to the debtor deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(8)(B).  Id. at *1—2.  The plaintiff argued that "the catch-all provision of subsection B [was] no longer limited by the more specific references contained in subsection A to governmental and non-profit lenders," id. at *5 (quoting the plaintiff's motion), and the "class of lenders discussed is [sic] subsection A [of § 523(a)(8)] [was] broadened to include the loan made by an individual such as [p]laintiff, if the loan were a 'qualified education loan' " under subsection B, id.  The parties filed cross-motions for summary judgment on the issue of dischargeability. Id. at *1.

34.  The Creeger court started its analysis by acknowledging that exceptions to discharge must be narrowly construed, id. at *4 (citations omitted), and limited to those "plainly expressed," id.

(quoting Bullock v. BankChampaign, N.A., 569 U.S. 267, 275 (2013)).
Ultimately, the Creeger court rejected the plaintiff's argument
that subsection B applied to the debt.   Id. at *6.   It decided
that the plaintiff's interpretation is contrary to "longstanding
public policies underlying the nondischargeability of student
loans as embodied in § 523(a)(8), long before [BAPCPA] added
§ 523(a)(8)(B)."   Id. Creeger acknowledges that one of the reasons
Congress designed the § 523(a)(8) statutory scheme was to remedy
abuses in the educational loan system where students who were
otherwise unattractive candidates for credit were taking out loans
and then filing bankruptcy soon after graduation and discharging
their educational debt.   Id. The court did not believe that there
was a public policy justification to support an expanded view of
"one of the Bankruptcy Code's harshest nondischargeability
provisions to individual lenders," nor any "legislative history
that would suggest that Congress intended to expand the statutory
protection in [that] manner" with the addition of § 523(a)(8)(B).
Id. at *7;   see London-Marable, 2008 WL 2705374, at *6 (concluding
that a loan agreement between individuals was dischargeable in
part because "[c]learly the financial integrity of such
educational loan programs is not implicated here by discharging a
private debt"); see 124 Cong. Rec. 1791, 1791–92 (1978)(statements
of Rep. Ertel) ("The purpose of this particular amendment is to
keep our student loan programs intact . . . [T]he default rate in

26

the student loan program has been escalating to tremendous proportions . . . [and] the number of students going into bankruptcy . . . has increased[.] Without this amendment, we are discriminating against future students, because there will be no funds available for them to get an education.").

35. The lender-debtor relationship before the court is similar to the relationship in <u>Creeger</u>. In both cases, there were close relationships that motivated the extensions of credit, not the traditional bank-student relationship. Unlike institutional lenders who need to be enticed with the prospect of nondischargeability to lend to risky borrowers without security, both the plaintiff in <u>Creeger</u> and the Jubers were not contemplating the concept of debt dischargeability when they chose to lend. The plaintiff in <u>Creeger</u> would likely have lent to Creeger regardless of her credit score, her status as a student, or her ability to obtain a cosigner, if need be; similarly, the Jubers made clear that the loan was for the benefit of the marriage, not to give a student an opportunity for an education. They did not guarantee or cosign her original student loan, and they were not even aware of the extent of her student loan debt until she graduated and became engaged to their son. Neither the <u>Creeger</u> plaintiff nor the Jubers needed, nor bargained for, the extra incentives offered by Congress through its enactment of § 523(a)(8). The Jubers are not part of any student loan program, the financial integrity of which Congress

sought to protect by the passage of § 523(a)(8). Neither the promissory note in Creeger nor the Promissory Note in this case made any mention of an educational purpose or referred to them as "education loans" or "student loans." And, tellingly, the Jubers were not even aware of the protections of § 523(a)(8) until the Debtor commenced her bankruptcy case and the couple discussed the matter with a friend at their church. The Jubers were motivated by the reality that their son would one day have some responsibility for these debts.

36. Under some circumstances a private loan between individuals could be nondischargeable pursuant to § 523(a)(8)(B). For example, several cases conclude that a debt is nondischargeable when a guarantor pays off a student loan. See, e.g., Miller v. Gomez (In re Gomez), Nos. 17-61024, 17-6048, 2017 WL 5952682, at *1-2 (Bankr. D. Or. Nov. 29, 2017).[2] These cases note that without

---

[2] Benson v. Corbin (In re Corbin), 506 B.R. 287, 296 (Bankr. W.D. Wash. 2014), Rust, 510 B.R. at 564, and De La Rosa v. Kelly (In re Kelly), 582 B.R. 905, 907 (Bankr. S.D. Tex. 2018) involve plaintiffs who were either cosigners or guarantors of student debts. In each case, the debtors defaulted on their student loan payments and the plaintiffs, as accommodation parties, were required to pay off the student loans. Corbin, 506 B.R. at 290; Rust, 510 B.R. at 565; Kelly, 582 B.R. at 907. When the debtors later tried to discharge their debts to the plaintiffs, the plaintiffs argued nondischargeability under § 523(a)(8)(ii). Corbin, 506 B.R. at 291-92; Rust, 510 B.R. at 565-66; Kelly, 582 B.R. at 907. The Kelly court notes that the text of § 523(a)(8) never uses the word "lender," and as such, accommodation parties such as the plaintiffs in Corbin, Rust, and Kelly, all came "within the universe of parties who [could] bring nondischargeability complaints." Kelly, 582 B.R. at 914. Kelly notes that the purpose of the statutory scheme was to protect government entities and non-profits. Id. Allowing cosigners to have the same protections as other institutional lenders further protected the government and non-profits because "many lenders would not provide loans without the backing of an accommodation party who would guarantee the debt." Id. at 912.

the guarantee of the original loan, the students likely would have been ineligible for an educational loan. Rust, 510 B.R. at 565. Thus, it makes sense that guarantors would be within the realm of those parties protected by § 523(a)(8). Allowing accommodation parties to have the same protections from discharge as government and non-profit lenders "supports the Congressional intent of allowing educational loans to be available to those who might not be able to get them on their own" and entices cosigners to lend a hand to students. Kelly, 582 B.R. at 912 (citing Rust, 510 B.R. at 572). The same cannot be said for the Jubers, as they did not guarantee the Three Original Loans, cosign the Three Original Loans, or in any way provide additional "financial backing" necessary for the Debtor to secure the Three Original Loans. Unlike the cosigners in Rust, Corbin, and Kelly, the Jubers' did not sign on to assist the Debtor in the event of default; the Jubers took over the Debtor's obligations in full and paid off the Three Original Loans out of love for their son.

III. <u>The Substance of the Transaction Test</u>

37. In addition to examining the statutory language at issue and analyzing the legislative history of § 523(a)(8)(B), the court will also consider the purpose of the loan by using the "substance of the transaction test," a test employed by many courts analyzing § 523(a)(8)(A) cases. See Tift Cty. Hosp. Auth. v. Nies (In re Nies), 334 B.R. 495, 501—02 (Bankr. D. Mass. 2005). While this

court cannot locate another court applying this test to the language of § 523(a)(8)(B), it is instructive in the absence of relevant case law given its application to other provisions of § 523(a)(8).

38. "A majority of courts ha[ve] adopted a test that determines the educational nature of the loan by focusing on the substance of the transaction which resulted in the obligation." Id. at 501 (citing DePasquale v. Bos. Univ. Sch. of Dentistry (In re DePasquale), 225 B.R. 830, 832 (B.A.P. 1st Cir. 1998)); see Sokolik v. Milwaukee Sch. of Eng'g (In re Sokolik), 635 F.3d 261, 266 (7th Cir. 2011); Murphy v. Pa. Higher Educ. Assistance Agency (In re Murphy), 282 F.3d 868, 870 (5th Cir. 2002). "The 'substance of the transaction test' reflects recognition of the congressional purpose of § 523(a)(8), namely to ensure the availability of educational financing." Nies, 334 B.R. at 502. Congress achieved its goal by "principally protect[ing] government entities and non-profits—*places which lend money or guarantee loans to individuals for educational purposes*—from bankruptcy discharge." Id. (alteration in original) (quoting TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 937 (1st Cir. 1995)). "The 'substance of the transaction test' recognizes that the purpose of § 523(a)(8) is to exempt entities that make educational loans from the effect of a borrower's bankruptcy discharge," Rumer, 469 B.R. at 562 (citing Nies, 334 B.R. at 501), and the statute itself is "concerned with

30

the circumstances surrounding the origination of the loan, rather than what benefits the debtor may have derived" from the loan, id. A "bankruptcy court reviewing a § 523(a)(8) case 'need only ask whether the lender's agreement with the borrower was predicated on the borrower being a student who needed financial support to get through school.' " Id. (quoting Sokolik, 635 F.3d at 266).

39.   In Nies, the debtor graduated from medical school and became a licensed practitioner in Massachusetts and Georgia. 334 B.R. at 497.   Tift County Hospital, a non-profit, tax-exempt corporation, was located in a rural part of Georgia and needed to bring in new doctors to address growing health and medical needs for the residents of Tift County.   Id.   The hospital implemented a recruitment program that provided recruited physicians with the "opportunity to receive loans up to $75,000 to repay their student loans."   Id.   Under the program, "any loan granted to a physician [was] forgiven, if the physician maintain[ed] a practice in Tift County over an agreed period of time."   Id.   After receiving an advertisement about this program through the mail, Nies submitted his resume to the hospital and ultimately entered "into an agreement . . . with the Hospital to relocate to Tift County." Id.   The agreement between the parties stated that the "Agreement [was] *in furtherance of its purpose of providing medical care to the public* in medical fields that [had] been determined by the Hospital to present a need that [was] not currently being serviced

. . . in the community." Id. at 498. As consideration for
relocating, "the Hospital agreed to provide [the Debtor] with a
$75,000 loan" that allowed physicians in the program to repay their
student debt. Id. The agreement further explained that if a
physician defaulted under the agreement or relocated her practice
out of Tift County within the timeframe provided in the agreement,
the entire loan would be due in full. Id. Nies ultimately
defaulted under the terms of the agreement and relocated outside
of Tift County well before his contractual term was complete. Id.
Soon thereafter, Nies and his wife filed bankruptcy and attempted
to discharge the obligation to the hospital by arguing that it was
not a student loan protected by § 523(a)(8). Id. at 498—99.

40. The Nies court reviewed the legislative history to date
and emphasized the unique nature of educational loans that
warranted protections under the Bankruptcy Code's discharge
provisions. Id. at 501. Nies notes that § 523 of the Bankruptcy
Code was the biproduct of reforms to section 439A(a) of the Higher
Education Act of 1965. Id. (quoting In re Shipman (Dep't of Mental
Health v. Shipman), 33 B.R. 80, 82 (Bankr. W.D. Mo. 1983)).
"[T]his direct link to the federal education statute is an
excellent indication that the central issue in determining
dischargeability is whether the funds were for educational
purposes, not whether the funds constituted a loan." Id. (quoting
Shipman, 33 B.R. at 82). As such, Nies employs the substance of

the transaction test to determine the purpose of the loan provided to the physician by the hospital. Id. at 501—06. Nies finds that the hospital had a business purpose and offered the loan to get the Debtor to come to Tift County. Id. at 505. It notes that the "use of the funds by a debtor is not determinative of whether . . . the loan is educational." Id. at 502 (citing Murphy, 282 F.3d at 873.

41. The Nies court explains that "courts have identified several hallmarks which suggest an educational purpose," including consolidation loans that explicitly cancel the underlying educational debt and create a new one. Id. at 504 (citations omitted). Moreover, Nies emphasizes that courts are "reluctant to conclude that the creditor made the loan for an educational purpose" where the loan was not made pursuant to some federal program. Id. (citing Resurrection Med. Ctr. v. Lakemaker (In re Lakemaker), 241 B.R. 577, 580 (Bankr. N.D. Ill. 1999); Shaffer v. United Student Aid Funds (In re Shaffer), 237 B.R. 617, 619—21 (Bankr. N.D. Tex. 1999)). The hospital's loan was not a consolidation loan because the terms of the loan did not explicitly cancel the underlying student debt—the agreement did not contain language about "subrogation, assumption, or discharge of the Debtor's underlying educational debt." Id. at 505. The agreement between the parties "reflected a non-educational business purpose for the loan, namely the recruitment of a physician for an

underserved rural area." <u>Id.</u> The "primary intent" of the hospital in "entering into the loan was to further the Hospital's central charitable and business mission, and not to offer the Debtor favorable financing terms to restructure his existing educational debt." <u>Id.</u>; <u>see also</u> <u>Segal</u>, 57 F.3d at 347, 349 (concluding that the purpose of the loan from the hospital was not to facilitate the doctor-debtor's education, "which had long since been completed," but instead for the hospital to secure her services); <u>Cmty. Mem'l Hosp. v. Gordon (In re Gordon)</u>, 231 B.R. 459, 461, 464—65 (Bankr. D. Conn. 1999) (dismissing a nondischargeabilty claim regarding a hospital's loan to a doctor-debtor because the advance served a business purpose by encouraging the debtor to establish a practice that furthered the hospital's mission).

42. Here, like the hospital in <u>Nies</u>, the Jubers' purpose in extending the loan was not to enable the Debtor to pursue an education. The hospital had a business purpose—to recruit a doctor to further its own personal mission—and the Jubers had a personal purpose—to protect their son and further their personal mission of setting the children on stable financial footing. The Oral Loan was not a consolidation loan because its terms did not explicitly cancel the underlying student debt. Further, the Debtor did not seek out the Jubers' in hopes of consolidating her debt, and the Debtor was not struggling to make her payments on the Three Original Loans when the Jubers approached her about the Oral Loan.

The Jubers' goal is underscored by their failure to file IRS Form 1098-E, which the Debtor would need to deduct the interest on the loan from her taxes, until they were instructed to do so by their bankruptcy counsel.  The fact that they did not provide her with the form suggests the purpose of the loan was not educational.

43.  Courts have also applied an analysis similar to the substance of the transaction test in cases examining the "educational benefit" language of § 523(a)(8)(A)(ii) by looking at whether a loan serves a "business purpose or an educational purpose."  See, e.g., Benson v. Corbin (In re Corbin), 506 B.R. 287, 297 (Bankr. W.D. Wash. 2014).

44.  In Corbin, the debtor was a receptionist for Greenpoint Technologies, and the vice-president of the company agreed to cosign the debtor's application for a student loan.  Corbin, 506 B.R. at 290.  Corbin used the proceeds to fund her educational expenses but ultimately left her employment at Greenpoint and defaulted on the loan; the vice-president stepped in and made payments on the loan "to avoid  adverse effects on her own credit rating."  Id.  The vice-president sought and received a judgment against Corbin in state court.  Id.  When Corbin later filed bankruptcy, she attempted to discharge the judgment under, among other provisions, § 523(a)(8)(A)(ii).  Id.  The court noted that a debt is nondischargeable as an "educational benefit" under this subsection if "the stated purpose for the loan is to fund

educational expenses." <u>Id.</u> at 296 (citation omitted). Referencing <u>In re Belforte</u>, the court found that there was "no business purpose to the [l]oan on either the part of [the vice-president] or Corbin." <u>Id.</u> at 297 (citing <u>In re Belforte</u>, Nos. 10-22742, 11-1008, 2012 WL 4620987, at *7 (Bankr. D. Mass. Oct. 1, 2012)). Instead, the funds were received to pay for educational expenses and the vice-president received "no consideration for her signature." <u>Id.</u> at 297. Consequently, the court concluded the loan was not dischargeable. <u>Id.</u>

45. Thus, in applying the substance of the transaction test to this case, it is clear that the Jubers issued a private loan to the Debtor that served a personal purpose rather than an educational one. Unlike the vice-president in <u>Corbin</u>, the Jubers did have an ulterior motive for using the HELOC to pay off the Three Original Loans: a love for their son and a desire to financially support his impending marriage.

IV. <u>Attorney's Fees</u>

46. The Jubers requested attorney's fees in this case and cited to the language of the Promissory Note that allowed for the same. Based on well-established case law, however, an award of attorney's fees to the Jubers would not be appropriate given the court's ruling in favor of the Debtor. <u>See In re Kelly</u>, 582 B.R. 905, 914 (Bankr. S.D. Tex. 2018); <u>Bank of Am. v. Rice</u>, 244 N.C. 358, 375 (N.C. Ct. App. 2015).

## Conclusion

The history of the transaction at issue coupled with the history amongst the parties, leaves little doubt that the Oral Loan was neither extended as nor intended to be an educational loan.   The Jubers cannot overcome the plain language of § 523(a)(8)(B) or the legislative history that tracks the creation of and amendments to § 523.   An application of the substance of the transaction test further bolsters the court's conclusion that the Jubers' purpose, although generous, was ultimately not meant to help the Debtor but, rather, their son.   Thus, the Oral Loan, and the subsequent Promissory Note, is dischargeable in the Debtor's bankruptcy case and will be treated as a general unsecured debt in the Debtor's Chapter 13 plan.   The court will enter a separate judgment consistent with this order.

**SO ORDERED.**

This Order has been signed                              United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.